SOUTHERN SURETY CO. v. MacMIL-
LAN CO.

No. 535.

Circuit Court of Appeals, Tenth Circuit.

April 12, 1932.

Rehearing Denied May 23, 1932.

PHILLIPS, Circuit Judge, dissenting.

Paul Pinson, of Tulsa, Okl. (R. C. Allen, I. J. Underwood, and Sam S. Canterbury, all of Tulsa, Okl., on the brief), for appellant.

Bruce McClelland, Jr., of Oklahoma City, Okl. (Philip Pierce, Louie G. Kneeland, and Robert O. Bailey, all of Oklahoma City, Okl., on the brief), for appellee.

Before PHILLIPS and McDERMOTT, Circuit Judges, and KENNEDY, District Judge.

McDERMOTT, Circuit Judge.

The appellee recovered a judgment of $17,890.66 upon a bond issued by appellant by which the performance of a certain contract between the Oklahoma Book Company and appellee was assured. The trial was without a jury, and upon a stipulation as to the evidentiary facts. The principal error assigned is that the trial court denied defendant's motion for judgment on such facts. The petition alleged the contracts hereafter referred to, and that the Oklahoma Book Company had failed to account for $3,804.70 cash due for books admittedly sold, and for $25,019.28 of books delivered to it, which the book company had reported as unsold, but which had been disposed of; and that notice of such default was given defendant on August 2, August 8, and September 21, 1929, as required by the bond. The prayer is for $20,000, the penal sum of the bond.

The answer admitted the execution of the bond, but alleged that the plaintiff had knowledge that the book company was not complying with its contract, but was embezzling funds; that it failed to notify the defendant; that all of the shortages sued for arose after plaintiff acquired such knowledge; that by its failure to give such notice "the rights of this answering defendant were thereby prejudiced and that this defendant thereby has been discharged and released and is liable for nothing herein"; that, had defendant been given such notice, it could have terminated its further liability. Defendant further alleges that plaintiff received $6,918.-35 from the liquidation of the book company, and that defendant's liability could not in any event, exceed $13,081.65. It is further alleged that the bond terminated on August 5, 1928, because the charter of the book company expired on that day; that it accepted premiums on the bond after that date without knowledge of the expiration of the charter; that no liability exists on account of defaults on August 5, 1928, because of failure of plaintiff to notify it thereof within 60 days, to its prejudice. Plaintiff's replication denies that it was aware that the book company was not faithfully performing its contract prior to the notice to the defendant; it admits the receipt of a dividend of $6,918.35, but alleges that its net loss exceeded the penal sum of the bond; that upon the expiration of the charter of the book company, a new charter was secured on August 24, 1928, and the business was carried on without interruption; that plaintiff had no knowledge of the expiration of said charter.

The material facts as stipulated are: On June 30, 1924, a contract was entered into between plaintiff and the state of Oklahoma, by which plaintiff agreed to supply promptly, through a depository at Oklahoma City, certain school books for sale and distribution, for a period of 5 years, at certain prices; and further agreed to maintain agencies accessible to the patrons of the common schools throughout the state. That contract specifically provides that the various terms "shall be construed both as covenants * * * and as conditions to the continuance of the contract."

This state contract was incorporated by reference in a contract of August 18, 1924, between the plaintiff and the book company. By that contract, plaintiff agreed to deliver on consignment, to the book company, within 30 days after notice of the quantity necessary, sufficient books to meet the market demand. The book company agreed to place such books on sale at points throughout Oklahoma, and was to receive a 10 per cent. discount for its services and expenses in distributing such books. The book company further agreed:

"Sixth: The party of the second part agrees to remit to the party of the first part on the first day of November, January, March and May of each year of this contract, payment in full for the sale of all books made by them up to the first day of October, January, February and April, respectively, said remittance to be accompanied by a statement showing the total sales at state contract prices and the total sales at exchange prices.

"Stock reports are to accompany these quarterly statements and these stock reports are to indicate the number of books on hand in the central depository and also the number in the hands of the agencies throughout the State of Oklahoma."

By paragraph 9, the book company agreed to be "accountable and responsible" to plaintiff for all books delivered.

To secure the performance of this contract, the book company and the defendant herein joined in the bond sued on; this bond incorporated the contract by reference; the pertinent provisions of the bond are:

"Now, the condition of the above obligation is such, that if the said Principal shall faithfully perform said contract on its part, and comply with and perform all and singular promises, obligations and conditions of the said contract, including the safe custody of all monies and proper remittance of the

same, according to its terms, and shall perform all the promises, obligations and conditions laid upon The MacMillan Company by their contract with the State of Oklahoma bearing date of June 30th, 1924, regarding the keeping of a sufficient stock of its adopted texts to meet all demands and shall render satisfactory service in the distribution of the same, then this obligation to be void; otherwise to remain in full force and effect.

"Provided, That the MacMillan Company shall keep, do and perform each and every, all and singular the matters and things set forth and specified in said contract, to be by The MacMillan Company kept, done and performed and exclusively at the times and in the manner as in said contract specified:

"Provided Further, That in the event of any default on the part of the Principal, written notice thereof by registered letter, with a verified statement of the facts showing such default and the date thereof, shall within sixty days after such default be mailed to the Surety at its office in Des Moines, Iowa.

"Provided Further, That the Surety may at any time terminate this obligation by giving thirty days' written notice by registered letter to The MacMillan Company of its desire to terminate this obligation but without prejudice to any claim for default during the time in which the bond was in force, although such default may not have been discovered when this bond was terminated, refunding to the Principal in this bond the pro rata unearned premium.

"Provided Further, That the said Surety shall not be liable for any amount in excess of the penalty of this bond."

No notice of any default was given the defendant until August 2, 1929. It is stipulated that the plaintiff did not suspect any error in the reports made from time to time, as to books on hand, until July 30, 1929. It did know that the quarterly reports were made late in many instances, and when made, were not accompanied by a full remittance of amounts due as shown by the reports; that the book company was falling behind in its cash remittances in substantial amounts; no notice of such delinquencies was given the defendant, as was agreed in the bond. The report due May 1, 1926, was made May 29, and full remittance did not accompany it, as the book company stated that a state warrant could not be collected before June 10. The reports due in the spring of 1928 were many days late, and were not then accompanied by remittances in full. In September, 1928, an indebtedness of $9,624.76 had been overdue for several months. On October 31, 1928, the book company was indebted for $3,624.76 on account of the preceding year's business. On November 24, 1928, a reconcilement of inventories disclosed a large error in the book company's books, growing out of the dishonesty of one of its employees; and the book company acknowledged an indebtedness in excess of $10,000 more than its books showed, for which a trade acceptance was given and paid. At that time, the indebtedness, including the trade acceptance, was $16,340.15. Without further detailing the proof, it discloses that the book company had been tardy in its reports and remittances as early as 1926; that it was delinquent in payment of substantial amounts conceded to be owing in 1928; that the delinquency was more than $16,000 in the fall of 1928, reduced to $3,804.70 by May, 1929; and that no notice of any such delinquency was given until in August, 1929, when plaintiff learned that the reported inventory of books on hand was false.

The defendant contends that the bond was terminated when the charter of the book company expired in 1928, relying upon the analogy of the death of an individual principal. Both parties were in ignorance of the fact that the charter expired; both contracted for a term extending beyond the corporate life. A new charter was promptly secured, and the business was maintained without interruption during the few days between the expiration of the old and the granting of the new charter. No prejudice of any kind is even claimed, and the circumstance of the charter expiring was an incident without significance. Illinois Surety Co. v. John Davis Co., 244 U. S. 376, 37 S. Ct. 614, 61 L. Ed. 1206, is very closely in point, and is adverse to defendant's contention. We think the bond was not discharged by this circumstance.

The principal defense to the bond is that the plaintiff failed to notify the defendant, as it agreed to do, of defaults on the part of the principal. It is urged, with much force, that in a continuing bond, the surety is entitled to know of any default, so that it may take steps to protect itself; that, unless such notice is given, a small rivulet may swell into a deep stream without the knowledge of the surety.

To this, plaintiff makes several answers.

It construes this clause as applying only to defaults which are to be made the basis of a claim against the surety company, and refers to the fact that the "verified statement of facts" required by the clause is the usual requirement of proofs of claim. The clause cannot be so limited. The plaintiff agreed to give notice of "any default," and we cannot change it. Next, plaintiff contends that it has no reference to mere delinquency in remitting amounts admittedly due, but only to defaults involving wrongdoing, such as false reports or embezzlement. But the book company agreed to remit on stated dates; failure to do so is a default. It is then claimed that notice is required only of substantial defaults; it may be that, if a report, accompanied by full remittance, was late but a day or so, a reasonable construction might make notice of such a trifling breach unnecessary. But the defaults of the book company were substantial in amount, and continued for a substantial length of time. We are of the opinion that plaintiff breached its agreement by failing to notify the defendant of the substantial defaults existing at least as early as the fall of 1928. The defendant had contracted to receive such notice; and it had a right to know, so that it might have taken such steps as it might be advised.

We come, then, to the principal and difficult question, Is this agreement as to notice a condition precedent to liability, or is it a concurrent promise, for breach of which plaintiff is liable for such damage as may flow from the breach? Are defendant's obligations under its bond abruptly terminated upon the failure to give notice, or must it show that it was prejudiced thereby, as it alleged in its answer? The defendant did not undertake to prove the prejudice alleged, either by showing that the rules or practices of the company were such that, if notice had been received, it would have exercised its option to cancel, or in any other way. It is stipulated that plaintiff had no knowledge of inventory losses, for which recovery was had herein; its knowledge was of delinquencies in cash settlement, which had been reduced from $16,000 in 1928 to $5,000 at the time the notice was sent. Defendant stands on the broad proposition that failure to give the notice terminated its obligations, whether it was prejudiced or not. Whether that be true, or whether it is entitled only to recoup the damages it suffered by the breach, is the pivotal question in this case.

There is a sharp divergence in the authorities as to the effect of failure to give notice of the default of a principal, where the bond expressly provides the liability of the surety is conditioned upon the giving of such notice. Many courts have held that such failure does not exonerate the surety, in the absence of a showing of prejudice.[1] On the other hand the Eighth Circuit has, since the decision of National Surety Co. v. Long (C. C. A.) 125 F. 887, consistently held that if the bond so provides, it will be enforced.[2] That rule is in accord with the many decisions of the Supreme Court of the United States holding that where the language used is unambiguous, the courts will enforce the

[1] School Dist. No. 1 of Clark County v. McCurley, 92 Kan. 53, 142 P. 1077, Ann. Cas. 1916B, 238; Community Bldg. Co. v. Maryland Casualty Co. (C. C. A. 9) 8 F.(2d) 678, a decision rendered in deference to the settled law in the state of Washington; Eilers Music House v. Hopkins, 73 Wash. 281, 131 P. 838; Maryland Casualty Co. v. Fowler (C. C. A. 4) 31 F.(2d) 881, 63 A. L. R. 1375; New Amsterdam Casualty Co. v. U. S. Shipping Board (C. C. A. 4) 16 F.(2d) 847; Lakeside Land Co. v. Empire Surety Co., 105 Minn. 213, 117 N. W. 431; Lackland v. Renshaw, 256 Mo. 133, 165 S. W. 314; Aetna Indemnity Co. v. Comer, 136 Ga. 24, 70 S. E. 676; Van Buren County v. American Surety Co., 137 Iowa, 490, 115 N. W. 24, 126 Am. St. Rep. 290; Bross v. McNicholas, 66 Or. 42, 133 P. 782, Ann. Cas. 1915B, 1272; Home Life & Acc. Co. v. Beckner, 168 Ark. 283, 270 S. W. 529; Dixie Ins. Co. v. American Bonding Co., 162 N. C. 384, 78 S. E. 430. It is contended that these cases are distinguishable because no continuing liability was involved. If, however, an owner fails to notify the surety when a contractor first defaults, the conditions may grow worse. In United States Fid. & Guaranty Co. v. Gray, 106 Okl. 222, 233 P. 731, 732, the court stated: "In the instant case, if the right claimed by the bonding company under the bond contract to notice was doubtful or uncertain, or if the bond contract itself, while requiring notice, had been silent as to the effect failure to give the notice would have on the rights of the obligee, then it would undoubtedly be the duty of the court to adopt that construction which would be most favorable to the obligee."

[2] Maryland Cas. Co. v. Bank of England (C. C. A. 8) 2 F.(2d) 793; New Amsterdam Cas. Co. v. Central Nat. Fire Ins. Co. (C. C. A. 8) 4 F.(2d) 203; St. Louis Architectural Iron Co. v. New Amsterdam Cas. Co. (C. C. A. 8) 40 F.(2d) 344; Thompson v. American Surety Co. of New York (C. C. A. 8) 42 F.(2d) 953; Odegard v. General Cas. & Surety Co. (C. C. A. 8) 44 F.(2d) 31; Home Bldg. & Sav. Ass'n v. New Amsterdam Cas. Co. (C. C. A. 8) 45 F.(2d) 989; Rice v. Fidelity & Dep. Co. of Maryland (C. C. A. 8) 103 F. 427; National Surety Co. v. Long (C. C. A. 8) 125 F. 887; United States Fid. & Guaranty Co. v. Rice (C. C. A. 8) 148 F. 206; Whalen v. Western Assur. Co. of Toronto (C. C. A. 2) 185 F. 490; Metropolitan Cas. Ins. Co. v. Johnston (C. C. A. 3) 247 F. 65, 7 A. L. R. 175 (accident insurance policy); Knight v. Castle, 172 Ind. 97, 87 N. E. 976, 27 L. R. A. (N. S.) 573; Gimbel Bros. v. Mitchell, 203 Mo. App. 610, 219 S. W. 676. In Thompson v. American Surety Co., supra, the bond provided that its obligation should "end, with the date of the discovery" of the principal's default. Our own court, in United States Fid. & Guaranty Co. v. Oklahoma, 43 F.(2d) 532, held in accord with the Thompson Case. There are a great many authorities that a surety is discharged where an employer fails to give notice of an injury to his employee.

contract made.[3] In any event, we are disposed to follow the settled law of the Eighth Circuit, and hold that if the parties have made the giving of notice a condition upon the obligation of the surety company, failure to give such notice relieves the surety company of liability.[4]

The divergence in opinion exists in cases where the agreement to give notice is expressly made a condition of the liability of the surety company, by apt words used for that purpose. No one of the expressions customarily used to condition such liability is found in this bond; and it is worthy of note that one of the contracts, incorporated in the bond, did use apt language to create a condition. We are therefore confronted with a question of construction, Did the parties intend that failure to give the notice, as agreed, should automatically terminate all obligation under the bond? Or did they intend that the agreement was a promise, the breach of which should render the plaintiff liable for any damage occasioned thereby?

■ In an effort to ascertain the intent of the parties to a contract, the language used by them should be fairly studied, and terms used ought to be taken in their plain, ordinary, and popular sense. This rule is as applicable to contracts of insurance as to any other contracts. Chase v. Business Men's Assur. Co. (C. C. A. 10) 51 F.(2d) 34, and cases therein cited. The rule of liberal construction in favor of the insured does not come into play unless a fair construction of the contract leaves the intent of the parties in doubt. This court said, in East & West Ins. Co. of New Haven, Conn., v. Fidel, 49 F.(2d) 35, 38: "But it is not true that a strained construction will be resorted to in order to establish an ambiguity which does not exist. Courts do not force an ambiguity in order to resolve it against an insurer." Judge Walter H. Sanborn, in Standard Life & Accident Ins. Co. v. McNulty (C. C. A. 8) 157 F. 224, 226, said: "But this rule ought not to be permitted to have the effect to make a plain agreement ambiguous, and then to interpret it in favor of the insured." See,

also, United States Fid. & Guaranty Co. v. Guenther, 281 U. S. 34, 50 S. Ct. 165, 74 L. Ed. 683, 72 A. L. R. 1064; Imperial Fire Insurance Co. v. Coos County, 151 U. S. 452, 462, 14 S. Ct. 379, 38 L. Ed. 231.

■ In examining the bond, the first thing noticed is that it contains "no express provision in the bond declaring that it shall be void if the notice of prior misconduct is not given."[5] Considering the care with which insurance contracts are drawn, the absence of such a common provision is significant. The next point is that the language used is that generally used in a promise, "notice shall be mailed," and not that generally used in a condition, "if notice is (or shall be) mailed." The next thing noticed is that all four paragraphs, after the condition of the bond, are introduced by the phrase "Provided" and "Provided Further." It is strongly urged that to introduce a term in a contract with the word "provided" is to designate that term as a condition on liability, and not as a promise, unless a contrary intent may be determined from the writing itself.[6] The Supreme Court has adverted to the matter in the following language:

"It is true that the word 'proviso' is an appropriate one to constitute a common law condition in a deed or will, but this is not the fixed and invariable meaning attached to it by the law in these instruments. On the con-

---

[3] In Guarantee Co. v. Mechanics', etc., Co., 183 U. S. 402, 419, 22 S. Ct. 124, 131, 46 L. Ed. 253, it was held that no rule of construction could "be availed of to refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties, and embodying requirements compliance with which is made the condition to liability thereon."

[4] The question is one of general law. Community Bldg. Co. v. Maryland Casualty Co. (C. C. A. 9) 8 F.(2d) 678; Odegard v. General Casualty & Surety Co. (C. C. A. 8) 44 F.(2d) 31; Northern Assur. Co. v. Grand View Bldg. Ass'n, 183 U. S. 308, 22 S. Ct. 133, 46 L. Ed. 213.

[5] The quoted language is from Judge Lewis' opinion in United States Fid. & Guaranty Co. v. Hughes (C. C. A. 10) 40 F.(2d) 34, 37. That bond did, however, make such notice an express condition; the point was not squarely raised, because notice of the misconduct in question was not required.

[6] Home Ins. Co. v. Union Trust Co., 40 R. I. 367, 100 A. 1010, L. R. A. 1917F, 375; Ormsby v. Phenix Ins. Co., 5 S. D. 72, 58 N. W. 301; Brewer v. Rust, 20 Okl. 776, 95 P. 233; Shipley v. Jacob Tome Institute, 99 Md. 520, 58 A. 200 (held not a condition); Robertson v. Caw, 3 Barb. (N. Y.) 410; Southern Colonization Co. v. Derfler, 73 Fla. 924, 75 So. 790, L. R. A. 1917F, 744; Wright v. Tuttle, 4 Day (Conn.) 313; De Vitt v. Kaufman County, 27 Tex. Civ. App. 332, 66 S. W. 224; Rich v. Atwater, 16 Conn. 409; Coykendall v. Blackmer, 161 App. Div. 11, 146 N. Y. S. 631; Cummings v. Lohr, 246 Ill. 577, 92 N. E. 970; Paschall v. Passmore, 15 Pa. 295; Forscht v. Green, 53 Pa. 138; Nusly v. Curtis, 36 Colo. 464, 85 P. 846, 7 L. R. A. (N. S.) 592, 118 Am. St. Rep. 113, 10 Ann. Cas. 1134. Other courts have said that, while it generally imports a condition, the entire contract must be looked to in order to determine the intent of the parties. Smalley v. Ashland Brown-Stone Co., 114 Mich. 107, 72 N. W. 29; Boston Safe Deposit & Trust Co. v. Thomas, 59 Kan. 470, 53 P. 472; Lyon v. Hersey, 103 N. Y. 264, 8 N. E. 518; Heaston v. Board of Com'rs, 20 Ind. 398; Trust Co. v. Phenix Ins. Co., 201 Mo. App. 223, 210 S. W. 98. Other courts have held it is the same as a conjunction, Doneghy v. Robinson (Mo. Sup.) 210 S. W. 655; and that it sometimes imports a condition, sometimes a limitation, sometimes a covenant, Stevens v. Galveston, H. & S. A. R. Co. (Tex. Com. App.) 212 S. W. 639; that it usually but not necessarily imports a condition, Davis v. Hancock, 95 Minn. 340, 104 N. W. 299.

trary, it gives way to the intent of the parties as gathered from an examination of the whole instrument, and has frequently been thus explained and applied as expressing simply a covenant or limitation in trust." Stanley v. Colt, 5 Wall. (72 U. S.) 119, 166, 18 L. Ed. 502.

"Where the undertaking on one side is in terms a condition to the stipulation on the other,—that is, where the contract provides for the performance of some act, or the happening of some event, and the obligations of the contract are made to depend on such performance or happening,—the conditions are conditions precedent. The reason and sense of the contemplated transaction, as it must have been understood by the parties and is to be collected from the whole contract, determine whether this is so or not; or it may be determined from the nature of the acts to be done, and the order in which they must necessarily precede and follow each other in the progress of performance. But when the act of one is not necessary to the act of the other, though it would be convenient, useful, or beneficial, yet as the want of it does not prevent performance, and the loss and inconvenience can be compensated in damages, performance of the one is not a condition precedent to performance by the other." New Orleans v. Texas & Pac. Ry., 171 U. S. 312, 334, 18 S. Ct. 875, 883, 43 L. Ed. 178.

In Huggins v. Daley (C. C. A. 4) 99 F. 606, 608, 48 L. R. A. 320, the question was "whether the proviso in the Hodges lease constituted a condition precedent." It was held that it did, but the court so determined after a consideration of the entire lease and the circumstances under which it was made; as to technical rules of construction, that court said: "There are no precise technical words which distinguish conditions precedent or subsequent. Whether they are one or the other is a matter of construction, to be solved by ascertaining the intention of the party creating the estate. They are not determined merely by the structure of the instrument, or the arrangement of the covenants."

Giving full force to the rule that the word "Provided" is more appropriate to a condition than a covenant, we do not feel that the use of the word stops the inquiry into the essential question, the intent of the parties as disclosed by their contract; even under the strongest statement of the rule, courts are not foreclosed from examining the entire contract. In this particular case, the third proviso cannot be construed as a condition upon liability, for it reserves to the defendant a right of cancellation; and the fourth proviso is a limitation upon, and not a condition of, liability. In this particular contract, the word "provided" has been indiscriminately used as an introduction to every paragraph of the contract after the one paragraph expressing "the condition of the above obligation."

The contract, the performance of which was guaranteed, is expressly made a part of the bond. We turn to it to find what was the performance guaranteed. We find that the book company agreed to place school books at every place in the state where they might be needed, which means of course in practically every hamlet in the state of Oklahoma. Four times a year it agreed to report to the plaintiff the number of books sold by every dealer in the state, and the number left in his hands, and to do this within 30 days. If a single dealer failed to report promptly the books sold and on hand, the book company could not literally comply with its agreement. While the book company guaranteed the payment for all books, it was doubtless in the contemplation of the parties that it would, as a general rule, undertake to collect from its dealers within that 30-day period. Some books were sold to the state, and getting vouchers through state offices is often a slow task. In such a widespread distribution, mechanical errors in counts and the like might, and did, require frequent reconciliations. This is the background against which this bond was made. True, the book company agreed to report and remit within 30 days; true, the plaintiff agreed to notify defendant if the book company defaulted. But can it be said that the parties intended that the bond should stand forfeited if there was a failure to notify of a default that, from the correspondence and the stipulation, gave plaintiff no suspicion that anything was wrong?

Considering the nature of the details of the performance guaranteed, the failure to use apt words to express an intent that obligation should cease upon the failure to give notice, the use of words of promise rather than of the happening of an event, we do not believe that the parties intended that liability upon the bond should end with the failure to notify, where no prejudice resulted from such failure. We think the reasoning of the Supreme Court of the United States in United States Fidelity & Guaranty Co. v. U. S., for Use of Pressed Brick Co., 191 U. S. 416, 24 S. Ct. 142, 48 L. Ed. 242, has some application to the case at bar. There the

548

bond was given under the federal statute governing buildings constructed for the United States, and was "conditioned not only upon the faithful performance of his work to erect the building according to his contract, and to any changes or additions made thereto, but to 'promptly make payment to all persons supplying him labor or material in the prosecution of the work contemplated by said contract.'" The latter provision was for the benefit of those who furnished labor or materials to the contractor; one of the materialmen brought suit on the bond. The defense was that the plaintiff had consented to a change in the obligation by accepting notes for materials furnished, without the consent of the surety; that, by so doing, the agreement of the principal to promptly pay was modified, and the surety exonerated. The court considered the uncertainty of the situation which confronted the surety company when it executed the bond, and held that, no prejudice being shown, the obligation of the surety was not discharged because of the extension of time granted by the plaintiff. The court said, at page 426 of 191 U. S., 24 S. Ct. 142, 144: "The rule of strictissimi juris is a stringent one, and is liable at times to work 'a practical injustice. It is one which ought not to be extended to contracts not within the reason of the rule, particularly when the bond is underwritten by a corporation which has undertaken for a profit to insure the obligee against a failure of performance on the part of the principal obligor. Such a contract should be interpreted liberally in favor of the subcontractor, with a view of furthering the beneficent object of the statute."

Mr. Williston deals with the situation here presented, where it is stipulated that "reports shall be made," as follows: "When a contract reads 'It is agreed,' or 'it is provided,' or 'it is stipulated,' or 'it is understood' that A shall do a certain act, or simply that the act shall be done it is not perfectly clear whether A promises to do the act in question, or whether he will acquire a right against the other party only by doing that act. Argument is possible that the words mean both these things. As matter of construction, it seems better to favor bilateral contracts than unilateral, and in bilateral contracts better, where the meaning of the agreement is doubtful, to construe words as involving a promise by the party who is expected to do the act in question than as words of condition. Such a construction protects both parties to the transaction, and also does not involve the consequences that a slight failure to perform wholly destroys all rights under the contract.

The law recognizes the propriety of this rule of construction." Williston on Contracts, § 665.

In any event, we cannot say that the contract is free from ambiguity, and plainly imposes a condition. The fact that the four judges who have minutely examined this contract are in disagreement as to its meaning, is some indication that its meaning is obscure. If ambiguity exists, there are two rules of construction which are applicable. The first is that ambiguities are resolved against the insurer. Graham v. Business Men's Assur. Co. (C. C. A. 10) 43 F.(2d) 673, and cases there cited. The second is well stated by Mr. Williston:

"In determining such a question at the present time little stress would be laid on refinements; rather the court would endeavor to interpret the meaning of the words used according to general principles of interpretation. A special rule of construction was established by the early cases which still might have some weight in case of ambiguity. If the performance which is urged to be a condition was also the subject-matter of a promise by the party from whom the performance was due, so that even though the words were not treated as words of condition there is a remedy to secure the performance of the act, the construction will be favored that no condition is meant; while on the other hand, if there will be no remedy to secure the performance of the act in question, unless the words can take effect as words of condition, because the contract contains no promise to render the performance, the construction will be given that the words create a condition. 'Courts are disinclined to construe the stipulations of a contract as conditions precedent, unless compelled by the language of the contract plainly expressed. The reason of this disinclination is that such a construction prevents the court from dealing out justice to the parties according to the equities of the case.'" Williston on Contracts, § 671.

"Because the enforcement of conditions frequently leads to forfeitures and penalties courts have always been indisposed to construe contracts as conditional, unless the language is too clear to be mistaken; and have frequently disregarded plainly expressed conditions, because of their unwillingness to deprive a promisee of all rights on account of some trivial breach of condition." Williston on Contracts, § 827.

We conclude that the agreement to give notice is not a condition upon the liability of the defendant.

Treating the stipulation as to notice as a promise, and not a condition, is plaintiff's breach thereof fatal to its recovery on defendant's promise? The rules applicable to this question, in the case of ordinary contracts, are the subject of an entire chapter in Williston's treatise on the Law of Contracts, c. 26. But one of those rules need be here noted, first stated by Lord Mansfield in Boone v. Eyre, 1 H. Bl. 273, in these words: "The distinction is very clear, where mutual covenants go to the whole of the consideration on both sides, they are mutual considerations, the one precedent to the other, but where they go only to a part, where a breach may be paid for in damages, there the defendant has a remedy on his covenant, and shall not plead it as a condition precedent."

The Supreme Court of the United States has stated the rule as follows: "The nonperformance on one side must go to the entire substance of the contract and to the whole consideration, so that it may safely be inferred as the intent and just construction of the contract that, if the act to be performed on the one side is not done, there is no consideration for the stipulations on the other side." New Orleans v. Texas & Pac. Ry., 171 U. S. 312, 334, 18 S. Ct. 875, 883, 43 L. Ed. 178.

It cannot be contended that the stipulation as to notice goes to the whole of the consideration moving to the surety company. The principal consideration for the agreement of the surety company was the payment of the premium. So it is that aleatory contracts—those where performance on the part of one is conditioned on a fortuitous event—are not governed by the rules applicable to ordinary contracts. In the Restatement of the Law of Contracts, the American Law Institute deals with the nonperformance of a counter promise in sections 261 to 284 (Topic C). It then deals with aleatory contracts in section 287 as follows:

"(1) The rules of Sections 261 to 284 (Topic C) are not applicable to a bilateral contract in which one promise is substantially aleatory or in which both promises are substantially aleatory but not conditional on the same fortuitous event; and, except as stated in Subsection (2), actual or prospective nonperformance by one party to such a contract does not discharge the other.

"(2) Either party to such a contract as is stated in Subsection (1) can, by giving notice of his intention to do so, rescind the contract, if

"(a) He has received no substantial benefit under the contract, and

"(b) It has not become more probable than when the contract was made that a fortuitous event will happen on which his duty to perform depends, and

"(c) There has been a material failure to perform the return promise or such prospective unwillingness or inability to perform as is stated in Sections 275 to 282.

"(3) If a contract is rescinded as permitted by the rule stated in Subsection (2), neither party thereafter has a right based on the other party's promise."

Essentially the same rule is laid down in Williston on Contracts, § 888, wherein it is stated that in such contracts the premium is paid for the risk—the promise and not the performance of it; therefore, performances are not contracted for as equivalent to one another. The elements for rescission not being present, and no such relief asked for, we conclude that "the nonperformance by one party to such a contract does not discharge the other."

It is strongly and persuasively urged that the surety company may suffer a real hardship unless this phrase is otherwise construed; that mighty oaks from little acorns grow; that a small default may grow into a large one, without knowledge of the surety company, and with no opportunity to protect itself. The danger is not a fancied one. On the other hand, hardship might be worked on the insured if it is construed as the surety company wishes; a single failure of the book company to report or remit in 1925, as required, might defeat liability for a theft in 1928, although the 1925 remittance was later made, and no harm came of it. But it is not a question of relative hardships. The surety company could have easily conditioned its liability on the giving of notice; the question is, Did it do so? We think it did not; its remedy therefore is to recoup any loss it suffered because of plaintiff's breach. Its answer three times alleged that it was prejudiced by plaintiff's breach; but it offered no evidence in support thereof. Presumably it could not prove that, under its rules and practices, it would have terminated its liability, returned premiums paid, and foregone premiums to come, because the book company was apparently honest but dilatory. No recovery was allowed on account of the failure to pay the sum of $3,804.70 admittedly due in May for books reported sold. The knowledge which plaintiff had was that the book company was tardy in remitting the cash for

books it reported as sold, and no recovery was allowed for this item; it is stipulated that plaintiff had no knowledge or suspicion of the default for which the recovery was had, the failure to account for books which it reported as on hand. Furthermore, the amount due for books reported sold had been reduced from $16,000 in 1928 to $3,800 in May of 1929. The trial court found no prejudice resulted from the failure to give notice of the default of which plaintiff had knowledge. In this action at law, that finding cannot be overturned.

▌ Defendant assigns as error that the trial court declined to hold that plaintiff, by its conduct, had changed its relationship with the book company from one of trust to one of debtor and creditor. Defendant argues that all it guaranteed was "the safe and separate custody of money" and the books; that, by not objecting to the book company's failure to remit on the day specified, the relationship became one of open credit not protected by the bond. This defense is not pleaded; however, the premise is unsupported by the facts. The bond describes the contract as one "including the safe custody of all moneys and proper remittance of the same, according to its terms;" but the description is inaccurate; no such provision is in the contract; on the contrary, it contemplates the relationship of debtor and creditor as soon as the books are sold.

▌ Defendant then contends that its liability, if any, is not in excess of the penal sum of the bond, $20,000, less the dividends received by the plaintiff in bankruptcy. The parties stipulated "that the following books reported as on hand unsold were not actually recovered or accounted for" amounted to $24,377.01; that the dividends applicable to items involved in this controversy, are $6,483.35. The judgment was for $17,890.66, which (excepting for a $3 error in subtraction) is the difference between the two. The court held the defendant for the loss which plaintiff suffered because the book company did not perform its contract. That is the bond. There is nothing in the bond concerning subrogation; if defendant had paid the entire loss, or had paid the penal sum of the bond, a question of equitable subrogation would be presented. New York Title & Mortgage Co. v. Bank (C. C. A. 8) 51 F.(2d) 485. It did neither. A contention is made in the briefs, but not mentioned in the answer or assignments of error, that the judgment should be reduced by $3,804.70, the cash balance due on May 1, 1929, for books reported as sold. The judgment does not include that sum. The parties have stipulated that there were $24,377.01 of books "reported as on hand unsold." This excludes the sum of $3,804.70, and all other items, for books reported as sold. The judgment was for $24,377.01, less the dividend. Since recovery has only been had for the value of books reported unsold, it cannot be decreased by the amount of cash due for books reported sold.

The judgment is affirmed.

PHILLIPS, Circuit Judge (dissenting).

I shall refer to the contract between the Surety Company and the MacMillan Company as "the bond" and to the contract between MacMillan Company and the Book Company as "the contract."

As early as May 29, 1926, the Book Company breached the provision of the sixth paragraph of the contract requiring it to make quarterly reports and remittances. In May, 1928, the agent of the MacMillan Company condoned the Book Company's failures to remit as required by the contract by stating, in a letter to the Book Company: "I am not asking for remittances * * * I understand * * * they will come along as usual and convenient." On November 24, 1928, the Book Company wrote the MacMillan Company stating that public accountants had discovered one of its employees had been carrying on peculations for a period of years and this had "left the stores in bad shape," and that it was surprised to learn that it owed the MacMillan Company $10,000 more than its records showed. On October 13, 1928, the Book Company owed the MacMillan Company $5,124.76 on the previous year's balance. These are examples of many defaults which occurred between May 29, 1926, and July 30, 1929. The president of the Book Company died on July 30, 1929. The circumstances surrounding his death aroused the suspicions of the MacMillan Company and caused it to write the following letter:

"July 30, 1929.

"Southern Surety Company, R. W. Wells, Manager, Tulsa, Oklahoma.

"Dear Sir: You are hereby notified that the Oklahoma Book Company, Oklahoma City, has failed to meet its obligations to us arising out of a contract entered into on August 18, 1924. As surety of Oklahoma Book Company you are advised that we shall look to you for protection to the amount of the bond, $20,000, against loss from said default.

"Very truly yours,

"The MacMillan Company

"By (Signed by J. Henry Phillips).

"JHP–ab"

This is the only notice given of any breach of the contract by the Book Company.

The last report made by the Book Company to the MacMillan Company was dated May 27, 1929, and covered the quarter ending March 31, 1929. An audit made after July 30, 1929, disclosed that books to the amount of $24,377.01 had been sold and not reported by the Book Company. Since the period following March 31, 1929, was at the end of the school year, a substantial portion of such books must have been sold and not reported long prior to the last report.

Notwithstanding such breach of the contract and knowledge that the employees of the Book Company had falsified its records with reference to the MacMillan Company's account, and embezzled the funds of the Book Company in substantial amounts, the MacMillan Company neither investigated the condition of the Book Company nor reported such information to the Surety Company in order that it might be warned of the necessity for investigation on its part.

The bond is in the nature of a contract of insurance and the rules applicable to ordinary contracts of insurance should be applied thereto. United States Fidelity & Guaranty Co. v. Centropolis Bank (C. C. A. 8) 17 F. (2d) 913, 918, 53 A. L. R. 295.

The rule is well settled in the United States courts that contracts of insurance, like other contracts, should be construed according to the sense and meaning of the terms employed, and that those terms ought to be taken, understood, and given effect in their plain, ordinary, and popular sense, and that it is only where, because of ambiguity in the language employed, the contract is fairly susceptible of two constructions—one favorable to the insured and the other to the insurer—that the rule of liberal construction in favor of the insured may be applied. Chase v. Business Men's Assur. Co. of America (C. C. A. 10) 51 F.(2d) 34; United States Fidelity & Guaranty Co. v. Guenther, 281 U. S. 34, 37, 50 S. Ct. 165, 74 L. Ed. 683, 72 A. L. R. 1064; Bergholm v. Peoria Life Ins. Co., 284 U. S. 489, 52 S. Ct. 230, 76 L. Ed. ——, decided Feb. 15, 1932.

The majority opinion holds that the paragraph of the bond with respect to notice is an independent covenant and not a condition.

Mr. Williston, in his work on Contracts, vol. 2, § 665, says:

"The distinction between a promise or covenant on the one hand, and a condition on the other, both in their legal effect and in their wording, is obvious and familiar.

Breach of promise subjects the promisor to liability in damages, but does not necessarily excuse performance on the other side. Breach of condition prevents the party failing to perform from acquiring a right, or deprives him of one, but subjects him to no liability."

The provision as to notice was breached. Therefore if it was a condition to the liability of the Surety Company, the judgment below was erroneous.

The majority opinion states: "No one of the expressions customarily used to condition such liability is found in this bond." With this I cannot agree. The word "provided" is an appropriate word to import a condition and is frequently so used in insurance contracts. Huggins v. Daley (C. C. A. 4) 99 F. 606, 610, 48 L. R. A. 320.

In Home Ins. Co. v. Union Trust Co., 40 R. I. 367, 100 A. 1010, 1011, L. R. A. 1917F, 375, the court said:

"The word 'provided' in instruments of this character [insurance contracts] in general has a well-settled legal meaning, and, construed in its natural and primary sense, imports a condition, and not an agreement."

In Graves v. Deterling, 120 N. Y. 447, 24 N. E. 655, 657, the court said:

"For time out of mind, conditions have usually been preceded by such words as 'proviso,' 'ita quod,' and 'subconditione,' or their modern equivalents."

The word "provided," construed in its natural and primary sense, imports a condition and not a covenant or agreement. Home Insurance Co. v. Trust Co., supra; Ormsby v. Phenix Ins. Co., 5 S. D. 72, 58 N. W. 301, 303; De Vitt v. Kaufman County, 27 Tex. Civ. App. 332, 66 S. W. 224; Rich & Hotchkiss v. Atwater, 16 Conn. 409, 419; Trust Co. of St. Louis County v. Phoenix Ins. Co., 201 Mo. App. 223, 210 S. W. 98, 102; Streicher v. Heimburge (Cal. App.) 262 P. 774, 776; Stockton v. Weber, 98 Cal. 433, 33 P. 332, 334; Southern Colonization Co. v. Derfler, 73 Fla. 924, 75 So. 790, L. R. A. 1917F, 744; Huggins v. Daley, supra.

In Home Insurance Co. v. Trust Co., supra, the court said:

"The plaintiff claims that the words in the mortgage clause, 'Provided that in case the mortgagor or owner shall neglect to pay any premium due under this policy, the mortgagee (or trustee) shall, on demand, pay the same,' import a contract by the mortgagee to pay the premium if the mortgagor does not pay it. The defendant claims that this clause

should be construed as a condition, and not as an agreement. * * *

"In Bouvier's Law Dictionary the following definition is given:

" 'A proviso always implies a condition unless subsequent words change it to a covenant.'

"In Rich & Hotchkiss v. Atwater, 16 Conn. 409, at page 419, the court says: * * *

" 'It is certain, as is said by Judge Swift, that there is no word more proper to express a condition than this word "provided"; and it shall always be so taken, unless it appears from the context to be the intent of the parties that it shall constitute a covenant.' * * *

"Had the intention been that the word 'provided,' as used in this clause, should not be given its primary legal meaning and effect, but that the clause should be construed as a covenant rather than a condition, any possible ambiguity could easily have been removed by the addition of a few words such as 'and it is agreed' or any similar phrase."

In Ormsby v. Phenix Insurance Co., supra, the court said:

"It will be noticed that the stipulation in the mortgage clause is that the insurance as to the interest of the mortgagee shall not be invalidated by any act or neglect of the owner or mortgagor, provided that in case the owner or mortgagor neglects or refuses to pay any premium due under this policy, then, on demand, the mortgagee or trustee shall pay the same; and provided, also, that the mortgagee or trustee shall notify the company of any change of ownership or increase of hazard which shall come to his or her knowledge, and shall have permission for such change of ownership or increase of hazard indorsed upon the policy. * * *

" 'Provided' is defined by Webster as: 'On condition; by stipulation.' * * *

"Mr. Anderson, in his Dictionary of Law, says of 'provided': 'No word better expresses a condition, and it is always so taken, unless the context shows that the intent was to create a covenant.' Rich v. Atwater, 16 Conn. 409. In this case there appears to be nothing in the subsequent language of the agreement indicating that the term 'provided' is intended as a covenant. Therefore, the clause in the mortgage contract that the insurance as to the interest of the mortgagee should not be invalidated by any act or neglect of the mortgagor or owner of the property insured ceases to be operative whenever there is a change of ownership or an increase

of hazard that comes to the knowledge of such mortgagee, and he fails or neglects to give notice of the same to the insurer, and has permission for such change of ownership or increase of hazard indorsed on the policy."

The word "provided" will be construed to express a condition unless from the context or from an examination of the instrument as a whole it appears that the parties intended otherwise. Cummings v. Lohr, 246 Ill. 577, 92 N. E. 970, 972; Rich v. Atwater, 16 Conn. 409; Streicher v. Heimburge, supra; Stockton v. Weber, supra; Home Insurance Co. v. Trust Co., supra; Southern Colonization Co. v. Derfler, supra.

Is there anything in the context or in the bond viewed as a whole which indicates that the parties intended the provision with respect to notice should be a covenant rather than a condition? The courts hold that notice is not due under such provisions until the insured or obligee has knowledge of the fact of which the insurer or surety is to be apprised, or until by the exercise of reasonable diligence the insured or obligee would acquire knowledge thereof. Van Buren County v. American Surety Co., 137 Iowa, 490, 115 N. W. 24, 126 Am. St. Rep. 290; Eggleston v. Ins. Co., 65 Iowa, 316, 21 N. W. 652; Bumstead v. Ins. Co., 12 N. Y. 81; Norton v. Ins. Co., 7 Cow. (N. Y.) 649; Lawrence v. Ins. Co., 11 Johns. (N. Y.) 260.

Thus construed such provision imposed no impossible condition or onerous requirement on the MacMillan Company. When the Book Company failed to make a quarterly report or remittance within the time required by the contract, or remitted only a portion of the amount due as shown by the report, it would have been a simple matter for the MacMillan Company, within the period of sixty days after such a default, to have mailed a duly verified notice thereof to the Surety Company.

The plain purpose of such provision was to insure that the Surety Company would be apprised or warned of any change in the condition of the Book Company that might increase the hazard of the guaranty so that it might investigate and, if it deemed the hazard so changed that it ought not to continue to insure against future defaults, that it might take advantage of its right to terminate the bond.

Not only is such provision preceded by the word "provided"—an appropriate word to express a condition—but it does not contain "promise" or "agree" or any word of like import. It will be noted that, while the

preceding paragraph states, "The MacMillan Company shall keep, do and perform * * * said contract," the provision as to notice not only does not in terms bind the MacMillan Company to do anything, but it does not even refer directly or indirectly to the MacMillan Company. The provision is:

"Provided, * * * (on condition) That in the event of any default * * * written notice thereof * * * shall within 60 days after such default be mailed to the Surety Company. * * *"

While it may be urged with some degree of logic that the provision with reference to the performance of the contract by the MacMillan Company is in the form of a covenant since it states what the MacMillan Company shall do, the provision as to notice in contrast thereto does not, and clearly is in the form of a condition.

The majority opinion suggests the bond does not in terms provide, as is frequently done in contracts of insurance, that a breach of condition shall forfeit the bond. It is not necessary for a contract to provide that which the settled law recognizes to be the effect of a breach of condition.

Finally, to construe the provision with respect to notice as an independent covenant would render it valueless to the Surety Company. The only remedy for the breach of an independent covenant is an action for damages; it constitutes no defense. In order to recover damages, the Surety Company would have to show that had it received notice it would have investigated the affairs of the Book Company and would have discovered conditions which would have caused it to terminate the bond. Such facts would be difficult if not impossible to prove.

Mr. Williston in his work on Contracts, vol. 2, § 665, says:

"As matter of construction, it seems better to favor bilateral contracts than unilateral, and in bilateral contracts better, where the meaning of the agreement is doubtful, to construe words as involving a promise by the party who is expected to do the act in question than as words of condition. Such a construction protects both parties to the transaction, and also does not involve the consequences that a slight failure to perform wholly destroys all rights under the contract."

I do not believe the meaning of the language is doubtful, and furthermore to construe the provision concerning notice as an independent covenant will not protect both parties to the transaction. On the contrary the result of so construing it is that the Mac-Millan Company responds to no damage for its flagrant, repeated, and substantial breaches of the provision on its part, and recovers from the Surety Company the full penal provision of the bond.

The guaranty of the Surety Company broadly provided for indemnity against any breach on the part of the Book Company of the contract which was to run for five years. Having regard for the broad scope of the guaranty, the period of time it was to run, the fact that the hazard of the risk might increase, the fact that damages for breaches of the notice provision would be difficult to prove, and the fact that the parties did not use apt words of covenant or promise, and did use words appropriate to import a condition, it is my opinion that the word "provided" should be given its usual signification and that such provision should be construed to be a condition.

The Surety Company is discharged if a condition known to the obligee, upon which the Surety Company agreed to be bound, is not complied with. Home Building & Savings Ass'n v. New Amsterdam Casualty Co. (C. C. A. 8) 45 F.(2d) 989, 991. In such a case the insurer need not show prejudice. Home Association v. Casualty Co., supra; St. Louis A. Iron Co. v. New Amsterdam Casualty Co. (C. C. A. 8) 40 F.(2d) 344.

For these reasons I am of the opinion that the judgment should be reversed with instructions to enter judgment for the Surety Company.